# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
MULLIGAN, HERRING, and BURTON
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Sergeant RANDON P. MAZZIE, JR.**
**United States Army, Appellant**

ARMY 20140923

Headquarters, Fort Campbell
Steven E. Walburn, Military Judge
Colonel Susan K. Arnold, Staff Judge Advocate

For Appellant: Captain Matthew D. Bernstein, JA (argued); Lieutenant Colonel Jonathan F. Potter, JA; Captain Heather L. Tregle, JA; Captain Matthew D. Bernstein (on brief and reply brief); Captain Heather L. Tregle, JA; Captain Matthew D. Bernstein (on brief in response to specified issue).

For Appellee:  Major Lionel C. Martin, JA (argued); Colonel Mark H. Sydenham, JA; Captain Anne C. Hsieh, JA; Major Lionel C. Martin, JA (on brief); Lieutenant Colonel A.G. Courie III, JA; Major Anne C. Hsieh, JA; Major Lionel C. Martin (on brief in response to specified issue).

2 December 2016

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

BURTON, Judge:

A military judge, sitting as a general court-martial, convicted appellant, contrary to his pleas, of one specification of rape, one specification of forcible sodomy, and one specification of assault consummated by battery in violation of Articles 120, 125, and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 920, 925, 928 (2006 & Supp. IV 2011) [hereinafter UCMJ].  The military judge sentenced appellant to a bad-conduct discharge, confinement for one year, and reduction to the grade of E-1.  The convening authority approved the sentence as adjudged and credited appellant with seven days against the period of confinement.

This case is before this court for review pursuant to Article 66, UCMJ. Appellant assigns one error concerning a discovery issue, which we find lacks merit. We discuss here an issue specified by this court concerning the effectiveness of appellant's trial defense counsel, but grant no relief. We have examined the matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and, to the degree not addressed in our resolution of the specified issue, find they lack merit.

## BACKGROUND

*A. The Rape and Following Examination*

On 8 February 2011, around 0200 to 0230, appellant called HA, the victim in this case, and asked her to come by his house to visit. HA knew appellant, as he was her husband's best friend. HA initially declined, but reconsidered when appellant explained that he needed to get something off his chest.

Appellant resided in a small house with two roommates, who were asleep in their rooms when HA arrived. HA and appellant went to his bedroom, where they talked and drank some alcohol. They eventually went to the kitchen to get more to drink. Once there, appellant asked HA to "cuddle," stating that her husband wouldn't care and, since HA's husband had cheated on her, it would be "okay." At that point, HA went back to the bedroom to gather her belongings to leave. Appellant followed, and continued his entreaty to HA. The conversation eventually turned to appellant's wife. HA, at appellant's request, had some time earlier tried to persuade appellant's wife to salvage their troubled marriage. When pressed why that effort failed, HA explained she could not prevent appellant's wife from leaving because she was a "whore." Appellant, angered, slapped HA in the face. After an exchange of slaps, appellant choked HA and pushed her onto the bed. Appellant then kissed HA and took off her sweatpants, despite her protestations. In the course of taking her pants off, appellant scratched her hip. Appellant, while holding HA down, then performed oral sex on her and eventually penetrated her vagina with his penis. He then flipped her over and tried to penetrate her anally. Finally, appellant attempted to place his penis in HA's mouth while holding her hair. When appellant let go of her hair for a brief moment, HA extricated herself, grabbed her belongings, and left appellant's house.

At about 0400, HA called her sister, JS, who lived in California. JS initially didn't understand HA, as HA was "sobbing incoherently." HA eventually told JS that "[appellant] raped me." JS told HA to get off the phone, call the police, and get to a hospital. HA, following this advice, called the police and eventually met up with an ambulance that escorted her to the hospital. HA arrived at the Blanchfield Army Community Hospital (BACH) at 0555 on the morning of 8 February 2011.

Ms. DL, a Sexual Assault Nurse Examiner (SANE) at BACH, met with and performed a sexual assault forensic examination (SAFE) of HA. DL's examination of HA noted contusions on HA's neck, one of which was consistent with the size of a person's thumb, as well as conjunctiva on the lower eyelids, both of which were consistent with strangulation. During the examination, HA reported tenderness on the back of her head, stating "[t]hat's where he grabbed my hair." DL noted an eight centimeter abrasion on AL's right thigh. Finally, an examination of HA's genital area revealed numerous abrasions, lacerations, and swelling. DL testified HA's injuries, both genital and non-genital, were in the top twenty by level of trauma of the 500 SAFEs performed by DL during her career. These injuries, as well, were consistent with HA's report and that intercourse had occurred.[1]

*B. Failure to Request the Prosecuting Attorney for the Commonwealth of Kentucky*

On 8 June 2012, the Commonwealth of Kentucky charged appellant with rape for the incident with HA. On 8 April 2013, appellant entered an *Alford*[2] plea to a lesser offense of assault and was sentenced to twelve months confinement, all of which was suspended, and placed on unsupervised probation.[3]

---

[1] At trial, DL testified on direct examination that research of injuries to a victim's vaginal area, like those suffered by HA, were four-times more likely the result of non-consensual intercourse. Upon questioning by the military judge, DL testified she could not determine whether HA's injuries were the result of a consensual or non-consensual encounter, but merely that they could be caused by a non-consensual encounter. The military judge then questioned the validity of the testimony concerning the four-fold likelihood of a non-consensual cause of the injuries, and made clear on the record that the ultimate determination of credibility rested with the court, not on DL's testimony concerning the causative nature of the injuries.

[2] *North Carolina v. Alford*, 400 U.S. 25, 37 (1970). ("While most pleas of guilty consist of both a waiver of trial and an express admission of guilt, the latter element is not a constitutional requisite to the imposition of criminal penalty. An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime.").

[3] At trial, appellant challenged the referral of charges in this case on the basis of unlawful command influence, asserting Army policy disfavors prosecution at a court-martial for the same offenses resolved in a state jurisdiction. Appellant submitted as an exhibit to his motion paperwork reflecting the disposition of the rape charge in Kentucky.

Prior to appellant's plea, KA, an attorney for the Commonwealth of Kentucky,[4] interviewed HA concerning the events of 8 February 2011. In preparation for trial, appellant's trial defense counsel, Major (MAJ) DD and Captain (CPT) DG, obtained notes prepared by KA during this interview. Appellant's trial defense counsel received these notes from KA after repeated attempts to locate her.[5]

These notes indicated that a photo of HA was posted on the social media website Facebook, named "Military Wives Exposed" (MWE). Though it is unclear from the notes what the full name of this website was, or how a photograph of HA was posted, it appears HA became aware the posting was sent to her husband's Facebook account. The notes indicate HA signed in to her husband's Facebook account to delete the post. Major DD was unable to find the MWE website based off the information in the notes, nor did he locate such a website on his own accord. Major DD requested appellant contact his mother or ex-wife, as they had Facebook accounts, to see if they still had the link to MWE. These requests also bore no fruit.

As to the events of 8 February 2011, the notes include an entry "forty-five seconds of oral sex to him." The notes also indicate HA's husband "gave her an ultimatum: 'rape or divorce,'" but provided no context for that comment from HA.

After interviewing KA, MAJ DD concluded "[KA] had virtually nothing to offer as a witness from her own recollection beyond what her notes said." He noted as well that the information in the notes was not sworn and most of the information was hearsay. Captain DG noted calling KA would possibly open the door to issues favorable to the government. One specific issue involved KA's failure to notify HA of the Commonwealth of Kentucky's plea agreement with the appellant, a fact that created the possible impression that appellant "[got] off easy" in the civilian criminal justice system. Finally, MAJ DD did not file a motion to compel production of KA because, based on his experience with this military judge, he could not meet the high burden of showing the relevance and necessity of KA's testimony.

At trial, defense counsel did not cross-examine HA concerning the apparent inconsistency with her testimony that appellant "attempted" to have HA perform oral sex on him and the notes which indicated oral sex actually occurred for forty-five seconds. Defense counsel likewise did not explore the MWE posting with HA.

---

[4] We granted appellant's motion to attach these notes to the record. The notes include the annotation "KA's Vic teleconference 1/3/13."

[5] We granted the government's motion to attach affidavits from appellant's trial defense counsel to the appellate record.

Defense counsel did question HA concerning her interview with KA. Specifically, defense counsel confronted HA concerning her husband's ultimatum that "either you were raped or we're getting a divorce." HA testified she had "never heard that before" and appeared to stumble in her response.

*C. Accused's Statements and Testimony Concerning the Events of 8 February 2011*

*1. Statement to Police on 8 February 2011*

At about 0800 on 8 February 2011, DC, an investigator for the Oak Grove, Kentucky, police department, initiated an interview with appellant. DC read appellant his rights and informed appellant he was suspected of raping HA. When asked about the night's activities with HA, appellant responded: "I never touched anybody. I didn't do anything. I was brought up to respect women. I didn't do a thing. All we did was watch a movie." Appellant related that he and HA watched a movie on Netflix. After about three quarters of the movie, they went to the kitchen, after which HA gathered her things and left.

*2. Statement to Investigating Officer on 24 September 2013*

Months after appellant's plea to assault in the Commonwealth of Kentucky, appellant's battalion commander appointed an investigating officer pursuant to Army Reg. 15-6, Boards Commissions, and Committees: Procedures for Administrative Investigations and Boards of Officers, [hereinafter AR 15-6], ch. 3 (2 Oct. 2006), to look into the allegations of rape involving HA. On 24 September 2013, an investigating officer appointed by the commander interviewed appellant concerning the rape allegation involving HA.[6] Following the interview, appellant signed a sworn statement concerning the events of 8 February 2011. In this statement, appellant recounted the events of the evening similarly, up to the point where he and HA went to the kitchen. Upon returning to the bedroom, appellant now claimed HA kissed him and proceeded to push his head towards her breasts. After about five minutes, appellant claimed he thought better of the situation and told her they needed to stop.

---

[6] Typically, parallel administrative investigations are not directed when there is an ongoing criminal sexual assault investigation. In fact, Department of Defense policy implemented since appellant's misconduct prohibits command-directed investigations into allegations of sexual assault. *See* Dep't of Defense Instruction 5505.18, Investigation of Adult Sexual Assault in the Department of Defense (25 Jan. 2013).

### 3. Appellant's Testimony at Trial

At trial, appellant testified on the merits and denied raping HA. He related the events in many ways similar to his 24 September 2013 statement. Specifically, he again claimed HA kissed him unexpectedly, which led to several minutes of kissing and HA pushing his head down towards her breasts. Appellant testified he had a "gut feeling" it was wrong and stopped the encounter. According to appellant, he and HA agreed not to tell HA's husband what had happened.

### D. Investigation of Ms. DL, the SANE Expert

Prior to trial, defense counsel became aware through a government discovery response that DL, the SANE who examined HA and later testified at trial, was the subject of an on-going informal investigation being conducted pursuant to AR 15-6. The government's response provided no details concerning the investigation, other than its existence. During a pretrial interview with defense counsel, DL indicated she thought the investigation involved whether she was writing prescriptions within her credentials when she worked at BACH. Major DD did not move to compel production of the contents of the ongoing investigation because he was unable to articulate how the investigation would benefit the defense. As the military judge declined even an in camera inspection of matters in other cases, MAJ DD concluded the military judge would not entertain a defense motion to compel. Accordingly, defense counsel did not file such a motion.[7]

The AR 15-6 investigation of DL was completed after appellant's trial, but in time for submission of appellant's post-trial matters under Rule for Court-Martial [hereinafter R.C.M.] 1105 and 1106. In these matters, defense counsel asserted that the "Army should and does have its own doubts about [DL's] professionalism and credibility."

The findings and recommendations for the AR 15-6 investigation of DL were approved on 26 January 2015. The report substantiated allegations that DL claimed on-call pay for periods when she was not on-call, provided continued treatment to sexual assault victims who were not eligible for military medical care, violated

---

[7] As our resolution of the specified issue focuses strictly on whether appellant suffered prejudice, we need not explore whether counsel's failure to file a motion to compel the contents of an ongoing investigation, as well as the failure to seek KA's presence at trial, was ineffective. However, we caution defense counsel that failing to file a motion, and preserve a possible issue for appeal, should not be based upon counsel's perception that a particular military judge will be disinclined to grant counsel's request.

hospital policy by prescribing narcotics for family members, prescribed medications for individuals not under her care, and failed to follow Army policy for closing medical encounters in a medical database and for an absence of records for narcotics prescriptions. None of the findings addressed or questioned DL's qualifications for performing SAFEs or the results of SAFEs she had performed at BACH.

## LAW AND DISCUSSION

We review allegations of ineffective assistance of counsel de novo. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citing *United States v. Gutierrez*, 66 M.J. 329, 330-31 (C.A.A.F. 2008). "Even under de novo review, the standard for judging counsel's representation is a most deferential one." *Datavs*, 71 M.J. at 424 (citing *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

To support an ineffective assistance of counsel claim, appellant must satisfy a two-prong test that his defense counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also United States v. Green*, 68 M.J. 360, 361-62 (C.A.A.F. 2010). We may resolve an ineffectiveness claim on the prejudice prong, without resolving the question of whether counsel's performance was deficient. *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

Upon review of the record, appellant has not met his burden of establishing prejudice, that being "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "It is not enough to show the errors had some conceivable effect on the outcome. . . ." *Id.* at 693. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

At trial, appellant denied he sexually assaulted HA, although he admitted some contact with her. The contact, he claimed, began when HA kissed him and ended when his conscience got the better of him. The problem with this claim is it contradicted his very first statement to the local police investigator, DC, on 8 February 2011, wherein appellant denied any contact with HA. To believe appellant, many of the witnesses offering testimony against him were incorrect or simply lying. It is with this backdrop we examine the appellant's ineffectiveness claims.

The government presented overwhelming evidence that HA was raped. DL, the SANE expert, officer DC, and HA's husband testified at trial that they saw the bruising to HA's neck. The timeline of the evening, as established through various witnesses, showed HA called her sister in a highly emotional state soon after leaving appellant's house to report the rape. Soon after that call, HA called the police, was

escorted to the hospital, and underwent a SAFE examination in the early morning hours of 8 February 2011. This examination, backed by photographs and physical findings, showed the scratch to her thigh, indications of strangulation, and trauma in her vaginal region.

### A. KA's Notes and Failure to Call Her as a Witness

We are satisfied there is no reasonable probability KA's testimony at trial would have altered the outcome in this case. As noted in DD's affidavit, KA remembered little about the case other than what was preserved in her notes. Additionally, there was little in the notes that was not hearsay, as the notes purportedly recounted HA's responses during a pretrial interview. In short, even if KA appeared at trial, there was little she could have offered that would not have been objectionable hearsay.

Appellant claims defense counsel was deficient in that he did not question HA about her statement to KA that HA performed oral sex on appellant for forty-five seconds. This evidence would not have changed the outcome of the case, as this line of questioning would have been cumulative with HA's Article 32, UCMJ, testimony that she performed oral sex on appellant for thirty seconds. At trial, HA acknowledged making this statement at the pretrial hearing, making any statement to KA cumulative. To the degree HA's trial testimony that appellant "attempted" to get her to perform oral sex on the appellant was inconsistent, the impeachment value of her prior statement was already before the fact finder.

In a similar vein, appellant argues defense counsel was ineffective by not questioning HA or calling KA concerning the lack of any reference to choking in KA's notes. We find this argument unpersuasive. The SANE examination of HA on the morning of the incident showed signs of strangulation. Officer DC and appellant's husband also saw bruising on HA's neck. We find no reasonable probability that airing HA's recollections to KA, apparently recorded about two years after the incident, would have resulted in a different outcome.

Finally, we are not persuaded that there is a reasonable probability that a different result would have been obtained had defense counsel cross-examined HA concerning the MWE posting. In this respect, defense counsel's affidavit shows he made every attempt to gain more information about this site and the supposed posting of HA's photo on the site by appellant. Even had this been raised by defense counsel at trial, we cannot possibly fathom the possible relevance to the defense case. Appellant did not claim at trial he had consensual intercourse with HA, thus creating a motive for HA to lie to save her marriage. The accused denied any sexual encounter beyond kissing. However, the physical evidence and the timeline showed sexual intercourse occurred at a time and in a manner consistent with HA's assertions.

*B. The AR 15-6 Investigation of DL*

There is no reasonable probability the allegations underlying the AR 15-6 investigation of DL, if known, would have caused a different result in this case. Appellant claims this investigation would have provided valuable impeachment evidence to undermine DL's testimony. We find that claim speculative. At base level, DL's violation of Army policies for prescribing medication and treatment to beneficiaries did not question her professional competence for conducting SAFEs. As for her ultimate opinions, the military judge showed he was able to weigh the basis of DL's testimony when he effectively disregarded DL's observation that the injuries suffered by HA were four times as likely to have been the result of nonconsensual intercourse. More to the point, the AR 15-6 investigation into DL would not have changed the introduction of the documented, photographed images of the injuries suffered by HA.

*C. Appellant's Claim of Ineffective Assistance of Counsel*

Appellant, through counsel and personally in an unsworn submission pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), alleges his trial defense counsel were ineffective for failing to fully investigate the case and use impeachment evidence against government witnesses. Other than KA's notes and the AR 15-6 investigation, appellant failed to offer any additional affidavits, unsworn declarations made under the penalty of perjury, or any signed statements supporting his specific claim of ineffectiveness. *See United States v. Axtell*, 72 M.J. 662, 665-66 (Army Ct. Crim. App. 2013). *See also United States v. Gunderman*, 67 M.J. 683 (Army Ct. Crim. App. 2009), and *United States v. Ellis*, 47 M.J. 20, 22 (C.A.A.F. 1997). Under the circumstances of this case, we see no need to order additional affidavits from counsel or a fact-finding hearing pursuant to *United States v. DuBay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967). The facts in appellant's allegations—even if true—"would not result in relief." *United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997). The matters alleged by appellant, through counsel and personally, had no reasonable probability of affecting the outcome of the case. Furthermore, appellant's claims as to a different outcome in his case, as demonstrated above, "consists of speculative or conclusory observations." *Id.* Applying the first, and second *Ginn* principles to appellant's unsworn submission, we reject appellant's ineffective assistance claim.

**CONCLUSION**

The findings and sentence are AFFIRMED.

Senior Judge MULLIGAN and Judge HERRING concur.

FOR THE COURT:

JOHN P. TAITT
Chief Deputy Clerk of Court